IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL CASE NO. |
| v. | 1:13-CR-00090-ODE-JFK |
| DANIEL WILLIAMS, | |
| Defendant. | |

**ORDER AND REPORT AND RECOMMENDATION**

Pending before the court is Defendant Daniel Williams' motion [Doc. 14] to suppress statements, motion [Doc. 16] to suppress evidence and motion [Doc. 15] for a bill of particulars. An evidentiary hearing was held on the motions to suppress on June 6, 2013. [Doc. 19].[1] In his post-hearing brief in support of the motions to suppress, Defendant contends that the statements he made on October 28, 2010, were involuntary[2] and that his consents to search his computer and his email account were

---

[1] Citations to the transcript of the hearing are: (Tr. at ).

[2] Defendant does not contend, after the evidentiary hearing, that he was in custody at the time he made these statements such that Miranda warnings were required. [Doc. 24 at 5-11]. The Government's brief in response, however, solely focuses on the issue of whether Defendant was in custody requiring Miranda warnings. [Doc. 26 at 4-8]. The court does not intend to address this issue, as voluntariness not custody is the basis upon which Defendant seeks to suppress his statement.

not voluntary. [Doc. 24]. The Government opposes the motions to suppress. [Doc. 26].

Defendant also seeks a bill of particulars providing details of the computer files, allegedly containing child pornography, that the Government contends he distributed. [Doc. 15]. The Government responds that the information sought has been provided in discovery, identifying where that information can be located, and requests that the motion, therefore, be denied. [Doc. 27]. The Government having provided the materials requested in the bill of particulars, the court **DENIES** the request [Doc. 15] for a Bill of Particulars as **MOOT**.

## Motions to Suppress

As noted, Defendant contends that the statements he made and the consents that he gave on October 28, 2010, were involuntary. [Doc. 24]. After consideration of the totality of the circumstances surrounding his statements and consents, the court recommends denying the motions to suppress.

**I.   Facts**

Special Agents with the Federal Bureau of Investigation ("FBI") received information regarding the distribution of child pornography by the user of a computer with an IP address that the agents linked to the single-family residence located at 2105

2

Noah's Ark Road, Jonesboro, Georgia. (Tr. at 4-5, 20). On October 28, 2010, in the late morning/lunchtime, FBI Special Agents Scott Warren and Sarah Johns-Lucas traveled to that residence. (Tr. at 5). The agents knocked on the door a couple of times, and after a few minutes, Defendant Daniel Williams opened the door. (Tr. at 6, 20-21). It appeared to the agents as though Defendant was leaving the residence not responding to their knocking. (Tr. at 6, 21).

The agents identified themselves and presented their credentials, explaining that they were conducting an investigation that was linked to the residence. (Tr. at 6, 21). They asked Defendant if they could speak with him about the investigation. He responded that he was on his way to apply for jobs. (Tr. at 6, 21). When the agents asked if he would wait to leave until after the interview, Defendant agreed and invited the agents inside the residence. (Tr. at 6, 21-22). Just inside the front door, in a room to the right, Defendant cleared off a table at which he and Agent Scott sat, while Agent Johns-Lucas remained standing by a window. (Tr. at 6-7, 22). The agents explained to Defendant that his cooperation was voluntary and that he was not under arrest; in fact, he was advised that he would not be arrested that day. (Tr. at 7, 26).

Although the agents were armed, the firearms were concealed under their clothing, and the firearms were not displayed during the interview. (Tr. at 7-8).

3

Defendant was not handcuffed or otherwise restrained during the interview, and he was not threatened. The agents did not make him any promises. (Tr. at 8-9). Defendant's demeanor was "relatively sociable" and chatting but "a little bit nervous." (Tr. at 24). The agents initially asked for background information learning that Defendant lived in the residence with his mother and sister.[3] (Tr. at 5, 9, 29). Defendant, who appeared to be in his early twenties, also advised that he had completed the ninth grade. (Tr. at 22-23). Defendant acknowledged having a computer, but he initially denied viewing or having any child pornography on his computer. (Tr. at 9, 23). He also initially denied having an email address. (Tr. at 23, 31).

Agent Warren advised Defendant that he, the agent, believed Defendant was being untruthful and advised Defendant that the agents knew that child pornography images had been downloaded on a computer located at that residence, and the agent showed Defendant a number of those images. (Tr. at 9, 23-24, 34). Defendant became emotional and cried. He asked if he was in trouble if he had lied. Agent Warren advised Defendant that, even if he was initially untruthful, if he told the agents the truth during the interview, he would not be in trouble for lying. (Tr. at 24-26). Defendant

---

[3]Agent Warren testified that he was not aware if anyone else was present in the residence because he did not conduct a search but that he did not see anyone else and no vehicles were parked outside. (Tr. at 5, 29).

4

then admitted having images, approximately one-hundred or so, on his computer. (Tr. at 9, 28). To the extent that he recalled the images, Defendant initialed the images Agent Warren had brought with him; however, Defendant did not recall and did not initial all of the images. (Tr. at 34-35). Defendant also stated that he did have an email address and provided the address to the agents. He denied and continued to deny using the email address to obtain or distribute child pornography. (Tr. at 13, 31-32).

Agent Warren then asked Defendant if he would consent to a search of his computer explaining that Defendant could refuse to consent to the search and could revoke any consent. (Tr. at 10, 30). At some point, Defendant left the agents and went to another location in the residence to retrieve the computer. (Tr. at 33). The agent presented a consent to search form which he allowed Defendant to review, and the agent read the form aloud to Defendant. (Tr. at 10; Gov't Ex. 1). The form provides in pertinent part that Defendant had been asked by the agents to permit a search of the identified computer, that Defendant had "been advised of [his] right to refuse to consent to this search," that Defendant gave his "permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind[,]" and that Defendant authorized the agents to seize any evidence found during the search. (Gov't Ex. 1). The agent asked Defendant to read the last sentence on the form aloud to ensure

5

that he could read, and Defendant did so. (Tr. at 10-11). Defendant signed the form. (Tr. at 11; Gov't Ex. 1).

Agent Warren explained to Defendant that due to the fact that the agents expected, based on Defendant's statements, to find contraband on the computer, it was unlikely that the computer would be returned to him. (Tr. at 12, 30). The agent produced a waiver of ownership of property form to Defendant and asked if Defendant would abandon his ownership rights in the computer. (Tr. at 11-12). The agent read this form to Defendant and allowed him to review the form, and Defendant then signed the form. (Tr. at 12, 30; Gov't Ex. 2). The agent next asked if Defendant would consent to the agents searching his email account to corroborate Defendant's statements that the account was not used to obtain or distribute child pornography. (Tr. at 13, 31-32). The agent presented a form to Defendant, which the agent read aloud and allowed Defendant to review. (Tr. at 13-14, 30; Gov't Ex. 3). The form provides in pertinent part that Defendant was "advised of [his] right to refuse consent[,]" that Defendant gave "this permission voluntarily[,]" and that Defendant authorized the agents to seize any items related to the investigation. (Gov't Ex. 3). Defendant signed the form. (Tr. at 14).

6

AO 72A
(Rev.8/82)

At the conclusion of the interview, Agent Warren asked Defendant if he would like to provide a written statement - to put into his own words his statement. (Tr. at 14-15, 32). The agent did not tell Defendant what to write or require him to provide a statement. (Tr. at 14-15). Defendant then wrote a short statement. (Gov't Ex. 4). The entire interview lasted approximately one hour. (Tr. at 15).

At no time during the interview did the Defendant advise the agents that he did not want to talk to them or that he wanted the agents to leave or state that he wanted to leave. (Tr. at 17). Defendant did not make any further comments about leaving to go job hunting. (Tr. at 27). Agent Warren testified that Defendant did not appear to be under the influence of drugs or alcohol and that Defendant did not appear to have any mental impairment and appeared to understand the agents. Defendant's responses were coherent. (Tr. at 16). Defendant was cooperative, and he never revoked his consents to search. (Tr. at 16-17).

Additional facts will be set forth as necessary during discussion of the motions to suppress.

**II. Discussion**

    **A. Statements**

7

Defendant contends that the statements he made to the FBI agents on October 28, 2010, should be suppressed because the statements were not voluntarily. [Doc. 24 at 5-11]. As noted, Defendant is not contending that he was in custody at the time the statements were made or that he should have been advised of the Miranda warnings. [Id.]. A review of the circumstances surrounding the statements, as outlined in the Government's response [Doc. 26 at 4-7], confirm that Defendant was not in custody; however, contrary to the Government's apparent argument that such a finding is dispositive of the issue before the court, the court must still determine that Defendant's non-custodial statements were voluntary.

The Supreme Court has recognized "that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined. . . .'" Beckwith v. United States, 96 S. Ct. 1612, 1617 (1976) (citation omitted). Defendant contends that such "special circumstances" exist in the present case and that he was coerced into making the self-incriminating statements involuntarily. As a result, it is the court's duty "'to examine the entire record and make an independent determination

8

of the ultimate issue of voluntariness.'" Id. (quoting Davis v. North Carolina, 86 S. Ct. 1761, 1764 (1966)).

In determining whether a statement was made voluntarily, courts are to evaluate "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 93 S. Ct. 2041, 2047 (1973). Those cases where courts have found confessions to be involuntary "have all contained a substantial element of coercive police conduct." Colorado v. Connelly, 107 S. Ct. 515, 520 (1986). "[F]actors taken into account have included the youth of the accused, . . . his lack of education, . . . or his low intelligence, . . . the lack of any advice to the accused of his constitutional rights, . . . the length of detention, . . . the repeated and prolonged nature of the questioning, . . . and the use of physical punishment such as the deprivation of food or sleep. . . ." Schneckloth, 93 S. Ct. at 2047 (citations omitted); see also Hubbard v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003) ("Among the factors we must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police"). "However, 'while [courts] have enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective

9

consent. . . .'" Hubbard, 317 F.3d at 1253 (citation omitted). "'Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.'" United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (citation omitted).

In this case, Defendant points to the following facts as supporting his claim that his confession was involuntary, including, his age (early twenties) (Tr. at 23), his education (limited to ninth grade) (Tr. at 22), being isolated in his home where he lives with mother and sister (Tr. at 5, 29), being asked to remain when intending to leave for job search (Tr. at 6, 21), and his demeanor (emotional and crying) (Tr. at 24-25). [Doc. 24 at 7-9]. While these factors do impact consideration of the voluntariness of the confession, the totality of the circumstances simply do not support a finding that Defendant's free will was overborne by coercive law enforcement conduct.

The special agents approached Defendant's residence seeking his voluntary cooperation and advised Defendant that his cooperation was being sought. (Tr. at 5-6, 21-22). Although Defendant had been intending to leave to go job searching, the agents asked - not directed - him to delay leaving and to remain to speak with them, and Defendant agreed inviting the agents into his residence. (Tr. at 6, 21-22). Thereafter,

10

Defendant never mentioned leaving the residence nor asked the agents to leave. (Tr. at 8, 17, 27). While it appears that neither Defendant's mother nor sister were present, the agents were unaware whether anyone else was home at the time they sought to speak to Defendant and apparently did not seek to "isolate" Defendant. (Tr. at 5, 29). Defendant was advised that he was not under arrest and, in fact, would not be arrested that day. (Tr. at 26). He was not handcuffed or otherwise restrained. (Tr. at 7). The agents did not display weapons or threaten Defendant. No promises were made to Defendant other than to advise him (when Defendant asked) that, if he had lied to the agents, he would not be in trouble, if he told the agents the truth. (Tr. at 8-9, 25-26).

Although Defendant's education was limited, Agent Warren testified that Defendant did not appear to have a mental impairment and did appear to understand the agents in that his responses were coherent. (Tr. at 16). Defendant only became emotional when advised by the agents that they did not believe him and when the agents presented Defendant with child pornography images believed to be downloaded on his computer. (Tr. at 9, 24-25, 34). The fact that Defendant initially attempted to mislead the agents indicates that he was not intimidated, and the fact that he continued to deny use of his email account for illegal activity and did not acknowledge recalling all of the images presented to him by the agents support the conclusion that the agents

11

did not coerce his statements. (Tr. at 13, 30-32, 34-35). Additionally, the entire interview - including obtaining the consents and Defendant writing out his statement - lasted only one hour. (Tr. at 15).

As the Supreme Court has recognized, "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." Oregon v. Mathiason, 97 S. Ct. 711, 714 (1977). However, courts have recognized that non-custodial interviews are not nearly as "inherently coercive" as those that take place while a suspect is in custody. New York v. Quarles, 104 S. Ct. 2626, 2630 (1984); accord United States v. White, 846 F.2d 678, 689 (11th Cir. 1988) ("The same concerns do not exist when interrogation does not occur in custody."). In the present case, the non-custodial interview of Defendant was not remotely close to being sufficiently coercive as to make his self-incriminating statements involuntary. Unlike other cases where police conduct was found oppressive, here the agents did not restrain Defendant and did not use or threaten to use physical punishment. See Connelly, 107 S. Ct. at 520 n.1 (citing Mincey v. Arizona, 98 S. Ct. 2408 (1978) (defendant subjected to four hour interrogation while incapacitated and sedated in intensive-care unit); Greenwald v. Wisconsin, 88 S. Ct. 1152 (1968)

12

(defendant, on medication, interrogated for over eighteen hours without food or sleep); Beecher v. Alabama, 88 S. Ct. 189 (1967) (police officers held gun to the head of wounded confessant to extract confession)). In addition, there is no evidence that Defendant, who is an adult, is totally uneducated or of low intelligence. See Schneckloth, 93 S. Ct. at 2047.

For the foregoing reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 14] to suppress statements be **DENIED**.

**B.     Consents**

Defendant likewise contends that the consents to search his computer and email address were involuntary.[4] [Doc. 24 at 11-13]. Defendant relies on the same facts to support a finding that his consents were involuntary. [Id.]. The Government opposes the motion to suppress arguing that Defendant's consents were in fact voluntary. [Doc. 26 at 8-9].

---

[4]Defendant also signed a waiver of property rights in the computer, which, as Agent Warren testified, is an administrative function akin to forfeiture of the computer (which is subject to forfeiture if it contains contraband). (Tr. at 11-12, 30). As the execution of this form, which followed the same procedure used by the agent for the consents to search, has no bearing on the evidence to be admitted at trial, the court will not further address the voluntariness of Defendant's waiver of his property rights.

13

"It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search [a vehicle] without a warrant so long as they first obtain the voluntary consent [for the search]." United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989) (citing Schneckloth, 93 S. Ct. 2041); accord United States v. DeJesus, 435 Fed. Appx. 895, 901 (11th Cir. 2011) (same). "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances." Id. at 798 (citing Schneckloth, 93 S. Ct. at 2059); see also United States v. Nuyens, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998) ("Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances."). "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Blake, 888 F.2d at 798 (citing United States v. Massell, 823 F.2d 1503, 1507 (11th Cir. 1987)); see also United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) ("A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'") (citation omitted).

As the Eleventh Circuit Court of Appeals affirmed in United States v. Acosta, 363 F.3d 1141 (11th Cir. 2004), "determining whether consent was 'voluntary is not

susceptible to neat talsmanic definitions; rather, the inquiry must be conducted on a case-by-case analysis.'" Id. at 1151 (quoting Blake, 888 F.2d at 798). In conducting this case-by-case analysis, factors considered by courts in assessing voluntariness include, but are not limited to: "'voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.'" Blake, 888 F.2d at 798 (citations omitted); see also Purcell, 236 F.3d at 1281 (same).

However, "the government need not establish [a defendant's] knowledge of the right to refuse consent 'as the *sine qua non* of effective consent.'" United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting Ohio v. Robinette, 117 S. Ct. 417, 421 (1996)); accord United States v. Brown, 223 Fed. Appx. 875, 880 (11th Cir. 2007) ("the government is not required to prove that the defendant knew he had the right to refuse consent, and a defendant's lack of knowledge of this right is not dispositive, but is just one factor to consider in evaluating the totality of the circumstances"); United States v. Pineiro, 389 F.3d 1359, 1366 n.4 (11th Cir. 2005) ("To the extent Pineiro suggests that the police were required to be more specific in

15

advising him of his rights, and were required to tell him he had a right to refuse consent, this Court has squarely rejected this argument."). And, contrasting the test for the waiver of "rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment[,]" Schneckloth, 93 S. Ct. at 2055, the Supreme Court explained that, while a consent to search must be voluntary, it need not be "'an intentional relinquishment or abandonment of a known right or privilege[,]'" that is, knowing and intelligent. Id. at 2055-56 (citation omitted); see also Tukes v. Dugger, 911 F.2d 508, 516 (11th Cir. 1990) (same). "'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of up-holding what appears to be a voluntary consent.'" United States v. Alim, 256 Fed. Appx. 236, 239 (11th Cir. 2007) (quoting United States v. Jones, 475 F.2d 723, 730 (5th Cir. 1973)).

The totality of the circumstances support a finding that Defendant's consents were voluntary. As already noted, Defendant was not in custody and was not restrained during his interview with the agents, and he was advised that he was not under arrest - nor would he be arrested that day. (Tr. at 7, 26). The agents did not display weapons, did not threaten him and did not make him any promises. (Tr. at 8-9). The agents advised Defendant that they were seeking his cooperation, that he could refuse to consent and that he could revoke any consent that he had given. (Tr. at 7, 10, 17, 26).

16

He knew about the nature of the agents' investigation and that they believed he had downloaded child pornography on his computer. He was not misled about the investigation. (Tr. at 9, 13, 23, 28, 34-35). And, while Defendant only completed the ninth grade, Agent Warren testified that Defendant did not appear to have any mental impairment and that Defendant did appear to understand the agents. (Tr. at 22, 16).

Additionally, the agents presented to Defendant a consent form for both his computer and email account. (Tr. at 10-11, 13-14, 30-31; Gov't Exs. 1 and 3). The consent form for the computer, in pertinent part, stated that Defendant had been asked by the agents to permit a search of the identified computer, that Defendant had "been advised of [his] right to refuse to consent to this search," that Defendant gave his "permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind[,]" and that Defendant authorized the agents to seize any evidence found during the search. (Gov't Ex. 1). The agent asked Defendant to read the last sentence on the form aloud to ensure that he could read, and Defendant did so.[5] (Tr. at 10-11). Defendant signed the form. (Tr. at 11; Gov't Ex. 1). The agent then presented

---

[5] This sentence states: "I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which it is stored, and any associated data, hardware, software and computer peripherals." (Gov't Ex. 1). The fact that Defendant read this sentence aloud undermines his contention that his education was so limited as to impair the voluntariness of his actions.

17

a consent form for the email account to Defendant, which the agent read aloud and allowed Defendant to review. (Tr. at 13-14, 30; Gov't Ex. 3). The form provides in pertinent part that Defendant was "advised of [his] right to refuse consent[,]" that Defendant gave "this permission voluntarily[,]" and that Defendant authorized the agents to seize any items related to the investigation. (Gov't Ex. 3). Defendant signed the form. (Tr. at 14).

The totality of the circumstances, including that Defendant was not in custody or otherwise restrained, that no physical force was used, that no threats or promises were made, that Defendant was advised he could refuse consent, and that Defendant executed two consent to search forms, establish that Defendant's consent was voluntary. See, e.g., United States v. Duncan, 356 Fed. Appx. 250, 252-53 (11th Cir. 2009) (consent voluntary under circumstances that the defendant, after answering door and being advised of a complaint of drug dealing in his residence, denied such activity, then, absent any threats, signed consent to search form); United States v. Baker, 206 Fed. Appx. 928, 930 (11th Cir. 2006) (consent to search home voluntary when the defendant signed a consent form at his residence where he was not being detained and no other threatening circumstances existed); United States v. Butler, 102 F.3d 1191, 1197-98 (11th Cir. 1997) (consent to search found voluntary when the defendant

18

answered the agents' knock at door, was told she could refuse consent, was cooperative and signed consent form). For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 16] to suppress evidence be **DENIED**.

## Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motions [Docs. 14 and 16] to suppress be **DENIED**.

And the court **DENIES** as **MOOT** Defendant's request [Doc. 15] for a bill of particulars.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**IT IS SO RECOMMENDED AND ORDERED**, this 5th day of September, 2013.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A (Rev.8/82)