

FILED IN CHAMBERS
U.S.D.C. - Atlanta

NOV 1 8 2013

James N. Hatten, Clerk

By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

DANIEL WILLIAMS

CRIMINAL CASE NO.

1:13-CR-90-ODE-JFK

ORDER

This criminal case comes before the Court on objections [Doc. 31] filed by Defendant Daniel Williams ("Defendant") to a Report and Recommendation ("R&R") entered on September 5, 2013, by United States Magistrate Judge Janet F. King [Doc. 28]. Magistrate Judge King recommended this Court deny Defendant's motions to suppress statements made by Defendant to government agents [Doc. 14] and his amended motion to suppress evidence obtained from the search of Defendant's computer and his email account [Doc. 16], and certified this case ready for trial [Doc. 28 at 19].

For the reasons discussed below, the Court MODIFIES IN PART Magistrate Judge King's findings, but ADOPTS the R&R's [Doc. 28] conclusions.

I.   **Background**[1]

Special Agents with the Federal Bureau of Investigation ("FBI") received information regarding the distribution of child

---

[1]Magistrate Judge King held an evidentiary hearing on the instant motions on June 6, 2013. The Court adopts the facts as found by Magistrate Judge King in the R&R, noting and addressing any objections asserted by Defendant to those facts as the Court proceeds.

pornography by the user of a computer with an IP address that the agents linked to the single-family residence located at 2105 Noah's Ark Road, Jonesboro, Georgia [Tr. at 4-5, 20].[2]    On October 28, 2010, in the late morning/lunchtime, FBI Special Agents Scott Warren and Sarah Johns-Lucas traveled to that residence [Tr. at 5].   The agents knocked on the door a couple of times, and after a few minutes, Defendant opened the door [Tr. at 6, 20-21].

The agents identified themselves and presented their credentials, explaining that they were conducting an investigation that was linked to the residence [Tr. at 6, 21].   They asked Defendant if they could speak with him about the investigation. He responded that he was on his way to apply for jobs [Tr. at 6, 21].   When the agents asked if he would wait to leave until after the interview, Defendant agreed and invited the agents inside the residence [Tr. at 6, 21-22].

Just inside the front door, in a room to the right, Defendant cleared off a table at which he and Agent Scott sat, while Agent Johns-Lucas remained standing by a window [Tr. at 6-7, 22].   The agents explained to Defendant that his cooperation was voluntary and that he was not under arrest; in fact, he was advised that he would not be arrested that day [Tr. at 7, 26].

Although the agents were armed, the firearms were concealed under their clothing, and the firearms were not displayed during the interview [Tr. at 7-8].   Defendant was not handcuffed or

---

[2]References to the evidentiary hearing transcript are cited as "Tr. at" page number.  The transcript is Doc. 19 on the docket.

otherwise restrained during the interview, and he was not threatened. The agents did not make any threats or promises to induce him to be interviewed [Tr. at 7-8]. Defendant's demeanor was "relatively sociable" and but "a little bit nervous" [Tr. at 24].

The agents initially asked for background information learning that Defendant lived in the residence with his mother and sister [Tr. at 5, 9, 29]. Defendant, who appeared to be in his early twenties, also advised that he had completed the ninth grade [Tr. at 22-23]. Defendant acknowledged having a computer, but he initially denied viewing or having any child pornography on his computer and stated that he used his computer for standard things such as job hunting [Tr. at 9, 23]. He also initially denied having an email address [Tr. at 23, 31].

Agent Warren testified he began suspecting Defendant was being untruthful early during the interview and that he conveyed to Defendant that he, the agent, believed Defendant was being untruthful [Tr. at 9, 24]. Defendant asked if he would get in trouble if it turned out he had lied. Agent Warren advised Defendant that, even if he was initially untruthful, if he told the agents the truth during the interview, he would not be in trouble for lying. Defendant then became emotional and cried [Tr. at 24-26].[3]

At some point during the interview, Defendant admitted to having viewed images of child pornography on his computer and

---

[3] The sequence of events leading up to Defendant's emotional breakdown is in the heart of Defendant's third objection to the R&R.

3

ultimately stated that he had approximately one-hundred images and/or videos of child pornography on his computer on that day [Tr. at 9, 28, 34]. To the extent that he recalled the images, Defendant initialed the images provided by the FBI lead office that Agent Warren had brought with him; however, Defendant did not recall and did not initial all of the images [Tr. at 34-35]. Defendant also stated that he did have an email address and provided the address to the agents. He denied and continued to deny using the email address to obtain or distribute child pornography [Tr. at 13, 31-32].

The agent presented a consent to search form which he allowed Defendant to review, and the agent read the form to Defendant [Tr. at 10; Gov't Ex. 1]. The form provides in pertinent part that Defendant had been asked by the agents to permit a search of the identified computer, that Defendant had "been advised of [his] right to refuse to consent to this search," that Defendant gave his "permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind[,]" and that Defendant authorized the agents to seize any evidence found during the search [Gov't Ex. 1]. The agent asked Defendant to read the last sentence on the form aloud to ensure that he can read, and Defendant did so [Tr. at 10-11]. Defendant then signed the form [Tr. at 11; Gov't Ex. 1].

Agent Warren explained to Defendant that due to the fact that the agents expected, based on Defendant's statements, to find contraband on the computer, it was unlikely that the computer would be returned to him [Tr. at 12, 30]. The agent produced a waiver of ownership of property form to Defendant and asked if

4

Defendant would abandon his ownership rights in the computer [Tr. at 11]12). The agent read this form to Defendant and allowed him to review the form, and Defendant then signed the form [Tr. at 12, 30; Gov't Ex. 2].

Agent Warren next asked if Defendant would consent to the agents searching his email account to corroborate Defendant's statements that the account was not used to obtain or distribute child pornography [Tr. at 13, 31-32]. The agent presented a consent to search form to Defendant, which the agent read aloud and allowed Defendant to review [Tr. at 13-14, 30; Gov't Ex. 3]. The form provides in pertinent part that Defendant was "advised of [his] right to refuse consent[,]" that Defendant gave "this permission voluntarily[,]" and that Defendant authorized the agents to seize any items related to the investigation [Gov't Ex. 3]. Defendant signed the form [Tr. at 14].

At the conclusion of the interview, Agent Warren asked Defendant if he would like to provide a written statement--to put into his own words his statement [Tr. at 14-15, 32]. The agent did not tell Defendant what to write or require him to provide a statement [Tr. at 14-15]. Defendant then wrote a short statement [Gov't Ex. 4]. The entire interview lasted approximately one hour [Tr. at 15].

At no time during the interview did the Defendant advise the agents that he did not want to talk to them or that he wanted the agents to leave or state that he wanted to leave [Tr. at 17]. Defendant did not make any further comments about leaving to go job hunting [Tr. at 27]. Agent Warren testified that Defendant did not appear to be under the influence of drugs or alcohol and

that Defendant did not appear to have any mental impairment and appeared to understand the agents.  Defendant's responses were coherent [Tr. at 16].  Defendant was cooperative, and he never revoked his consents to search [Tr. at 16-17].

## II.  Magistrate Judge King's Recommendations

In her R&R filed September 5, 2013 [Doc. 28], Judge King recommended that Defendant's motion to suppress the statements he gave to the government agents [Doc. 14] and his motion to suppress the evidence seized from the searches of his computer and his email account [Doc. 16] be denied.[4]

Judge King first determined that the totality of all surrounding circumstances supported the conclusion that Defendant's statements to the FBI agents on October 28, 2010 were voluntary.[5]  Judge King's conclusion was based on the following facts: (1) Defendant agreed to delay leaving and invited the agents into his residence; (2) Defendant was told he would not be arrested that day; (3) Defendant was not handcuffed or restrained; (4) the agents did not display their weapons or threaten Defendant; (5) the entire interview lasted only an hour; and (5) Defendant initially attempted to mislead the agents and continued to deny the use of his email account for illegal activity [Doc. 28 at 10-12].

---

[4]Magistrate Judge King also denied as moot Defendant's request for a bill of particulars providing details of the computer files containing child pornography allegedly distributed by the Defendant [Doc. 28 at 2].

[5]Judge King noted that Defendant was not in custody at the time he made the statements, and Defendant does not object to that finding.

While Judge King acknowledged Defendant's limited education, she noted that he did not appear to have a mental impairment and that he understood the agents as demonstrated by his coherent responses [Id. at 11].    Judge King further indicated that "Defendant only became emotional when advised by the agents that they did not believe him and when the agents presented [him] with child pornography images believed to be downloaded on his computer" [Doc. 28 at 11].

Judge King's determination that Defendant's consents to search his computer and email address were voluntary rested largely upon the same grounds.  In addition, Judge King noted that Defendant signed the consent forms for the search of both his computer and email account, even though he was advised that the agents believed he had downloaded child pornography on his computer and that he could refuse to consent [Doc. 28 at 16-19].

## III. Discussion

### A. *Standard of Review*

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), the Court must conduct a de novo review of those portions of the R&R to which Defendant timely and specifically objected.  If there is no specific objection, the Court reviews the R&R for clear error. Tauber v. Barnhart, 438 F. Supp. 2d 1366, 1373-74 (N.D. Ga. 2006) (Story, J.)(citing HGI Assocs., Inc. v. Wetmore Printing Co., 427 F.3d 867, 873 (11th Cir. 2005)).

The Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by Magistrate Judge King. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3); United States v.

Raddatz, 447 U.S. 667, 673-74 (1980).  The Court deems Defendant to have waived his right to request review of any portions of the R&R to which he failed to timely and specifically object.  FED. R. CRIM. P. 59(b)(2).

B.   *Defendant's Specific Objections*

Defendant raises four objections to Magistrate Judge King's R&R.  Specifically, Defendant challenges Judge King's finding that Defendant "only became emotional when advised by the agents that they did not believe him and when the agents presented [him] with child pornography images believed to be downloaded on his computer [Docs. 28 at 11 & 31 ¶ 3].

Defendant further objects to Judge Brill's determination that Defendant's low intelligence is not supported by any evidence in the record [Doc. 31 ¶ 2].  Finally, Defendant disagrees with Judge King's conclusion that Defendant's statements to the FBI agents were not coerced and that his consents to the search and seizure of his computer and to the search of his email account were voluntary [Id. ¶¶ 1, 4].

C.   *Analysis*

1.   **Timing of Defendant's Emotional Breakdown**

Defendant asserts that, contrary to Magistrate Judge King's finding, he started crying before he admitted to possessing child pornography and before he was shown the images that the agents believed he had downloaded on his computer.

The record demonstrates that at some point during the interview Agent Warren felt Defendant was not being truthful [Tr. at 9].  As the interview progressed, Defendant asked the agents what would happen if it turned out he had lied to them.  Agent

8

Warren told Defendant that he would not get in trouble for lying as long he told the truth at the end. At that point, Defendant became emotional, started crying, and began telling the agents about the pornography on his computer [Id. at 24-25]. After he had already admitted to viewing child pornography on his computer, Defendant was shown images of the child pornography believed to be downloaded from his computer [Tr. at 24-25, 34-35].

Having reconstructed this chronology of events from the evidentiary hearing transcript, the Court concludes that Defendant became emotional and started crying after the agents advised him they did not believe him but before he was shown images of child pornography believed to be downloaded on his computer [Tr. at 9, 24-25, 34]. Accordingly, Judge King's finding on page 11 of the R&R is MODIFIED as follows: "Defendant only became emotional when advised by the agents that they did not believe him" [Tr. at 9, 24-25, 34-35].

### 2. Evidence of Defendant's Low Intelligence

Defendant contends that the following facts in the record reflect his low intelligence level: (1) that he has completed only the ninth grade; (2) that he was unemployed at the time at issue; and (3) that his written statement to the FBI agents demonstrates a lack of ability to punctuate and contains misspellings of basic words such as "and" and "upset."

The Court agrees with Judge King's conclusion that the record is devoid of any evidence to demonstrate Defendant's low intelligence. As noted by Judge King, Agent Warren testified that he did not observe any type of mental impairment that prevented

9

Defendant from understanding the agent, and that Defendant's answers were coherent [Tr. at 16].

Although Defendant did not graduate from high school, he did complete the ninth grade and can read. In fact, Defendant was asked to and did read aloud the following sentence on the consent to search form he signed: "I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which it is stored, and any associated data, hardware, software and computer peripherals" [Tr. at 22; Gov't Ex. 1].

In addition, the fact Defendant was unemployed at that time does not necessarily compel the conclusion that he is unemployable because of his marginal intelligence level. On the contrary, the record shows that Defendant was able to and did use his computer for job hunting and other standard tasks [Tr. at 23].

Finally, although Defendant's handwritten note contains no punctuation marks and misspells the words "and" and "upset," Defendant was able to hand write the note despite his emotional state, and he spelled words such as "downloaded," "wrong," and "fault" correctly [Gov't Ex. 4].

Based on the above, the Court agrees with Judge King that Defendant's demeanor, along with his reading comprehension and writing skills as reflected by the record do not support a finding of low intelligence.[6]

---

[6]Accord, e.g., Hubbard v. Haley, 317 F.3d 1245 (11th Cir. 2003)(rejecting the defendant's contention that his verbal and full scale I.Q., both in the borderline mentally retarded range, rendered his statement involuntary, in part based on the district court's finding that the defendant was "free of mental disease or defect and was able to understand the charges against him and to cooperate," despite his intermittent treatment for alcoholism).

### 3.    Voluntariness of Defendant's Statements

Whether a statement was "the product of 'an essentially free and unconstrained choice,'" and was thus voluntary, is determined from the totality of the circumstances. Hubbard v. Haley, 317 F.3d 1245, 1252-53 (11th Cir. 2003)(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973); United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989)). "Among the factors [the court] must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." Hubbard, 317 F.3d at 1253.

Consistent with the R&R's conclusion, the Court finds there is no indicia in the record to suggest that Defendant's statements to the FBI agents were anything but voluntary. First, Defendant invited the agents into his residence and made some space for them to sit [Tr. at 6-7]. Second, he was not restrained in any way and there is no indication that the officers used any force; on the contrary, the agents did not display their weapons, nor did they raise their voices even after they began sensing Defendant was not being forthcoming [Id. at 7-8].

Next, the agents made no inducements or promises to Defendant, other than to address his concern about lying to them [Id. at 8-9]. Furthermore, although Agent Warren asked Defendant if he wanted to write a statement, Defendant composed the statement by himself and in his own words [Id. at 14-15]. Finally, the entire interview, including obtaining Defendant's statement and his consents, lasted about an hour [Id. at 15].

The Court notes that the fact Defendant became emotional and started crying before he was shown the child pornography images believed to be downloaded on his computer does not negate his earlier attempt during the interview to mislead the agents. Because at the time of his emotional breakdown Defendant had not yet admitted to possession of the images, this manipulative effort bespeaks "an essentially free and unconstrained choice" on his part.

Lastly, as already determined above, there is no evidence that Defendant's intelligence was anything less than average. Notwithstanding, in the absence of coercive police activity, a defendant's low intelligence level would not in itself render his or her statements involuntary. See Singleton v. Thigpen, 847 F.2d 668, 671 (11th Cir. 1988)("coercive police activity is a necessary predicate to a finding that the confession by a person with a low intelligence level is involuntary.") (internal quotation marks and citation omitted). In summary, the totality of the circumstances in the instant case contravenes Defendant's claim that the statements which he gave to the agents were coerced.

### 4.    Voluntariness of Defendant's Consents

For consent to serve as a valid exception to the general warrant requirement, the Government must prove that the consent "was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968). Consent has been held invalid when it was "coerced by threats or force, or granted only in submission to a claim of lawful authority." Schneckloth, 412 U.S. at 233-34 (citing cases). Some relevant factors for determining voluntariness include:

12

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984)(citations omitted). The Chemaly factors are not exhaustive; the voluntariness of the consent "is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227.

The factors set forth in Chemaly counsel against suppressing the evidence obtained from the seizure and searches of Defendant's computer and from the searches of Defendant's email account. In addition to the reasons stated in Part III.C.3. above, the record demonstrates that Defendant knew about the nature of the investigation and the agents' belief he had downloaded child pornography on his computer [Tr. at 9-10]. The agents advised Defendant he had a right to refuse to consent and he read aloud the last sentence of the consent form authorizing the agents to seize his computer along with the evidence found during the search; yet he still chose to sign the consent to search forms for both his computer and email account [Id. at 10-13]. Finally, Defendant did not appear to have been suffering under any impairment that would undermine the consent he gave [Id. at 16].

Viewing Defendant's consent in the instant case in light of the totality of the circumstances, the Court finds that it was knowing and voluntary, and that it was not "coerced by threats or force, or granted only in submission to a claim of lawful authority." Schneckloth, 412 U.S. at 233-34.

**IV.  Conclusion**

    For the reasons above, the R&R [Doc. 28] is hereby MODIFIED IN PART and ADOPTED IN PART.  The Court substitutes its finding contained in Part III.C.1. and adopts the R&R in all other respects.

    SO ORDERED this __*18*__ day of November, 2013.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE

14